## UNITED STATES FIDELITY & GUARANTY CO. v. UNITED STATES.

(Circuit Court of Appeals, Fourth Circuit. February 5, 1924.)

No. 2162.

1. **Levees and flood control** ⟨⟩16—**Evidence in action on contractor's bond held to raise immaterial issue.**

In suit on bond of government contractor, constructing levees, testimony that civilian assistant of the engineer officer threatened that, if a steam stump puller was not provided and a supply of coal brought in for fuel, no further estimates would be approved, and no money paid the contractor, raised an immaterial issue, where such assistant had no right of his own motion either to take the contract from the contractor or to stop the payment of any sums due it.

2. **Appeal and error** ⟨⟩1050(1)—**Proof that contractor became bankrupt did not injure surety.**

In a suit on contractor's bond, where it appeared contractor's abandonment of work was unjustifiable, proof of the fact that the latter became bankrupt could not hurt the surety.

3. **Levees and flood control** ⟨⟩16—**In action on contractor's bond, communications between engineer officers held admissible.**

In action by United States on bond of contractor, constructing levees, correspondence between engineer officer on the ground and the Chief of Engineers at Washington *held* admissible to show that the Chief of Engineers had, on reasonable ground, sanctioned the taking away of the contract.

4. **Levees and flood control** ⟨⟩16—**Evidence of increased cost and price adjustments under other contracts properly excluded.**

In an action on bond of contractor, constructing levees to be completed December 31, 1917, court did not err in rejecting testimony that unforeseen conditions arising out of the war increased the cost of doing the work, and as to price adjustments made under levee contracts in accordance with provisions of Acts of Congress approved July 18, 1918, and March 2, 1919, there being no offer to show that the contractor or surety asked the Secretary of War for relief under either act.

In Error to the District Court of the United States for the District of Maryland, at Baltimore; Morris A. Soper, Judge.

Action by the United States against the United States Fidelity & Guaranty Company. Judgment for the United States, and defendant brings error. Affirmed.

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Samuel K. Dennis and J. Kemp Bartlett, both of Baltimore, Md. (William M. Hall, of Memphis, Tenn., on the brief), for plaintiff in error.

Morton P. Fisher, Asst. U. S. Atty., and A. W. W. Woodcock, U. S. Atty., both of Baltimore, Md.

Before WOODS, WADDILL, and ROSE, Circuit Judges.

ROSE, Circuit Judge. The United States Fidelity & Guaranty Company is plaintiff in error here, but will be spoken of as the defendant, the position it occupied below. It was surety upon the bond of the Oglesby Construction Company, hereinafter called the contractor, which entered into a contract with the United States to construct in the Upper St. Francis levee district certain levees to form part of the general scheme of the Mississippi river improvement in that region. Under circumstances to be presently described, the contractor on or about July 21, 1917, abandoned the work, very much the greater part of which was still unfinished, and never returned to it. The government advertised for proposals to finish it. When the bids were opened, it was found the lowest of them exceeded the amount of the available appropriation. They were all rejected. In the original contract, that which was to be done was divided into a number of parts, for each of which a separate and distinct charge was made. When the government found out that it had not enough money at command to have all these done by others, it invited offers for certain items, and awarded a contract for the doing of them. It waited a year or more before entering into agreements for the construction of the others. The aggregate amount which it has paid out for all of the work is several hundred thousand dollars more than the contract price, and greatly exceeds the penalty of the bond.

This suit was brought for that penalty, but the learned court below held that the government could not recover for the excess cost under such of the new contracts as were not awarded with reasonable promptness; conditions having in the interval materially changed to the contractor's hurt. The government acquiesced in this ruling. The defendant is here seeking to reverse the judgment which was given against it for the extra cost of doing that portion of the work, the new contract for which was made without undue delay.

The original contract upon which defendant became surety was entered into September 1, 1915, and called for the completion of the undertaking by December 31, 1917. There were many delays, not a few of them due to weather and river conditions, so that on the 21st of July, 1917, a very small part of the work had been completed. The engineer officer in charge for the government had by July 13 come to believe that satisfactory progress was not being made, and particularly that, although the contractor had "arrived at the beginning of the season, when the best progress should be made," it had failed to make any preparations for a vigorous prosecution of the work, and it "did not now appear to be making any attempt for such preparation." Under the circumstances, it seemed to him that the contractor was "grossly negligent." On the day last mentioned, he in writing told the contractor

so, and gave it formal notice to meet him at his office in Memphis on July 21, 1917, at 10 a. m., to show cause why the contract should not be taken out of its hands, under the provisions of paragraph 4 of the agreement. A copy of this letter was sent the defendant. The paragraph mentioned provided, among other things:

"That if the contractor shall in the judgment of the contracting officer fail to prosecute faithfully and diligently the work in accordance with the specifications and requirements, the contracting officer shall have power with the prior sanction of the Chief of Engineers to take the work out of the hands of the contractor by giving notice in writing to the contractor and his surety or sureties, and, upon the giving of such notice, all payments to the contractor under this contract shall cease, and all money or reserved percentage due or to become due thereunder shall be retained by the United States until the final completion and acceptance of the work."

In article 3 of the agreement it was further provided:

"That the contractor should prosecute the work, perform the services, and furnish and deliver the materials at a rate sufficient in the opinion of the contracting officer to secure completion within the contract time."

If it failed to make such progress, the contracting officer was given power, after 10 days' notice in writing to the contractor, to employ such additional labor, to purchase such materials, and to liquidate such obligations of the contractor as the contracting officer might deem necessary to put the work in the proper state of advancement, or to insure the proper completion of the undertaking within the time specified and any excess cost thereof over what the work, services, or material would have cost at the contract rate or rates, would be charged against any sums due or to become due the contractor.

On the 21st of July some of the officers of the contractor and certain other persons whom they brought with them, at the office of the engineer officer, had an interview with his civilian assistant, who had direct supervision over the work under this contract. The conference was a lengthy one, and some years elapsed before most of the witnesses testified concerning it. It is therefore not surprising that there are different versions of what was said. It is, however, agreed that the government officer expressed himself as dissatisfied with the way the work was being carried on. He did not think there was enough cordwood provided to keep the engines actively at work, and he believed that reasonable progress could not be made without a steam stump puller, which the contractor did not have. At the close of the interview all understood that the contractor would in writing communicate with the government officer its decision as to what it would do.

Accordingly it did so in a letter of the same date, which stated that it was a reply to the engineer's letter of the 13th, which it said requested the contractor to show why the contract should not be taken out of its hands. It stated that it had carefully considered the contents of the letter and the delinquencies which had been pointed out in the execution of the contract. It said that it noted the engineer's insistence that additional and increased provision should be made in the preparation of the right of way which was ahead of the machine and that additional and increased provision should be made for fuel and for the operation of a double shift. It said it was unnecessary to reiterate

all the unavoidable difficulties and unforeseen conditions which the contractor had to contend with from the very beginning of the work. This had all been explained to him. It said it had used every effort to meet the conditions of the contract, and had done the very best it could under the circumstances and conditions. It had expended very large sums of money, including all that originally had been put into it, and large sums in addition had been borrowed. The contract had been let at a very low figure, since which time, by reason of war conditions and other uncontrollable circumstances, the cost of operation had increased to an enormous extent. It said that it was doing all that was in its power, and was unable to do any more or to increase its facilities beyond those which it was then employing. The concluding paragraph was:

"We can, therefore, only submit the situation as it exists for your consideration, for such action as you and the other officers of the government deem advisable in the premises."

The contractor on the same day finally abandoned the work, before any reply was received, or could have been expected, and in advance of the taking of any action by the government. This abandonment is justified by the defendant on the ground that at the conference on July 21 the government agent said that, if a steam stump puller was not provided and a supply of coal brought in for fuel, no further estimates would be approved, and no money paid the contractor. There was such testimony, and it is immaterial for any present purpose that it was contradicted, or that it is easy to understand how some of the witnesses came to think they remembered it, although nothing more may have been said than, if some provision for carrying on the work more rapidly was not made, the government, under the powers reserved in the contract, would take it from the contractor, with the necessary result that all payments would cease. Such matters, if relevant, would be for the jury, and defendant's principal complaint is that they were not left to that tribunal.

[1] Quite clearly, however, this civilian assistant of the engineer officer had no right of his own motion either to take the contract from the contractor or to stop the payment of any sums due it. No such power was given him by the government, expressly or by implication. No payments were at the time in arrear. If, when they came due, he had actually succeeded in stopping them, the government might have been liable for what he did. His stoppage might then have been constructively its act, but his unauthorized threat to stop bound no one. The learned judge below was therefore right in holding that the testimony on this question raised an immaterial issue.

[2, 3] Error is assigned to the admission in evidence of the fact that the contractor, some months after it abandoned the contract, went into bankruptcy. If, as we have just held, the contractor's abandonment of the work was unjustifiable, the proof of the fact that it later became bankrupt could not have hurt the defendant. The like may be said of the correspondence between the engineer officer on the ground and the Chief of Engineers at Washington, and such communications were in any event clearly admissible to show that the Chief of Engineers had, upon reasonable ground, sanctioned the taking away of the contract.

[4] The only remaining assignment of error is as to the rejection of certain testimony offered by the defendant to the effect that after April 6, 1917, the cost of materials and labor and other unforeseen conditions arising out of the war between the United States and Germany increased the cost of doing the work at least 100 per cent., and that, under a general order of the Secretary of War, the United States Engineer's Office at Memphis, Tenn., in charge of the levee construction of the Mississippi district, issued instructions to all levee contractors whose contracts were entered into prior to April 6, 1917, and the work on which had not been completed prior to the entrance of the United States into war with Germany, that their contracts had become inequitable and unjust, on account of increased cost in labor and materials, and other unforeseen conditions arising out of the war, and that it was deemed to be equitable and just. that the price on their contracts should be increased by adding thereto the increased cost or costs, so far as the work remaining to be done after April 6, 1917, was concerned, and that said price adjustments were made under all said contracts in accordance with the provisions of the Acts of Congress approved July 18, 1918 (40 Stat. 904), and March 2, 1919 (40 Stat. 1275).

There is nothing in either of these statutes to suggest that Congress ever intended to substitute the verdict of a jury for the judgment of the Secretary of War under the first act, or for its own under the second. The defendant did not offer to show that either it or the contractor ever asked the Secretary for relief under either act, or that he had ever given it or recommended to Congress that it be granted, or that either of them had ever given the consent required by the act of July 18 for the readjustment of the terms of the contract. Moreover, the Act of July 18, 1918, is expressly limited to work done after its passage. By the terms of the contract the work here in controversy should have been completed not later than December 31, 1917, and in point of fact, it was abandoned by the contractor as early as July 21, 1917. The statute of March 2, 1919, it is true, does apply to work done between April 6, 1917, and July 18, 1918, but it provides for nothing more than an investigation by the Secretary of War and a report to Congress.

Finding no error in the rulings below, the judgment is affirmed.